*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 12-CF-185, 12-CF-186, 12-CF-190, 12-CF-191

GREGORY TROTTER & ERNEST PEE, APPELLANTS,

V.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF1-11395-10, CF3-19509-10, CF1-11478-10, CF2-22044-10)

(Hon. Gerald Fisher, Trial Judge)

(Argued December 2, 2014                                Decided  July 23, 2015)

*Claire H. Pavlovic*, Public Defender Service, with whom *James Klein*, *Jaclyn S. Frankfurt*, and *Christine A. Monta*, Public Defender Service, were on the brief, for appellant Gregory Trotter.

*Steven R. Kiersh* for appellant Ernest Pee.

*Katherine M. Kelly*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, and *Deborah L. Sines*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and BLACKBURNE-RIGSBY, *Associate Judges*, and REID, *Senior Judge*.

GLICKMAN, *Associate Judge*:  In armed robberies committed at check-

cashing stores in Northeast Washington, D.C., on May 28 and June 17, 2010, one

of the victims was killed and two others were pistol-whipped. Appellants Trotter and Pee, found by a jury to have perpetrated the robberies, appeal their convictions for first-degree felony murder, armed robbery, conspiracy, second-degree burglary while armed, and multiple other offenses. We affirm.

**I.**

On May 28, 2010, Sadhak Chakroborty's check-cashing store on Minnesota Avenue Northeast was robbed by two men armed with handguns who were dressed like construction workers and wearing dust masks to cover their faces. Much of the robbery was captured on videotape by a surveillance camera. The robbers' faces are not visible in the video, but their overall appearances matched those of appellants. The tall, skinny robber (later identified as Trotter), who can be seen in the video holding a revolver in his right hand, pistol-whipped Chakroborty in the head, threatened to kill him, and forced him to open the store's safes and cash register. The shorter and stockier robber (later identified as Pee) held a semiautomatic weapon in his left hand and acted as a lookout. The two robbers left with approximately $6,500 in cash, some merchandise, and a number of blank checks from Chakroborty's personal and business accounts.

The stolen checks were recovered when a heroin addict named Anthony Evans tried to cash them. Evans told the police and testified at trial that appellant Trotter gave him the checks to cash and that they agreed to split the proceeds.

Three weeks later, on June 17, 2010, the check-cashing store on Benning Road Northeast operated by Prithvi Singh and his son Prabhjot Rajan Singh was robbed of some $40,000 in cash. This robbery also was caught on videotape. The robbers were two men wearing masks and baseball caps. The men were similar in overall appearance to the men who robbed Chakroborty's store, and to Trotter and Pee. The taller of the two men, whose hair was in dreadlocks (like Trotter's), held a revolver in his right hand. His shorter and stockier companion held a semiautomatic handgun in his left hand. The two men attacked Prithvi Singh, repeatedly hitting him with a gun in the mouth and head and knocking out a tooth. Prabhjot Singh came out of a back room and pushed the taller gunman out the door into the street, where a struggle ensued. The videotape shows the gunman's baseball cap falling off his head during the struggle and a small object falling from his pocket. The two men grappled with each other on the ground until the robber managed to shoot Prabhjot Singh in the head. The wound was fatal. Witnesses saw the two gunmen flee in a gold Kia automobile with Maryland tags; one of the witnesses, a Metro bus driver, was able to record part of the license plate number.

The witnesses saw the shorter robber (allegedly Pee) get in the Kia on the driver's side as his companion (allegedly Trotter) entered on the passenger side.

At trial, Andre Tate, a friend of both Trotter and Pee, testified that they told him in June 2010 how they had robbed a check-cashing store on Minnesota Avenue the previous month wearing construction outfits. Both men said the robbery had been violent. Tate further testified that on June 16, 2010, he drove Trotter and another man, Glenn Savoy, to "case" the check-cashing store on Benning Road. Savoy said it would be "suicide" to rob the store because there were cameras everywhere and only one exit, which according to Tate made Trotter "disappointed and mad." The next day, Trotter showed up at Tate's house and told him he had gone ahead and robbed the Benning Road store, that it had been "turmoil . . . from the beginning to the end," and that "things kind of went wrong." Trotter said one of the men in the store "ran to him as if he didn't have a gun in his hand" and landed on top of him. Trotter admitted shooting the man in the head and said he might have killed him. He also told Tate that he had lost his hat and his cellphone during the robbery. Trotter gave Tate a .38 caliber pistol and asked Tate to hold it for him.

That evening, Tate called the police and reported to Detective Mitchell Credle that Trotter and Pee were involved in the Benning Road robbery. A few days later, Tate told Credle that he had Trotter's gun and turned the weapon over to the detective. A firearms examiner testified that a bullet found on the sidewalk outside the Benning Road store had been fired from this gun. DNA testing revealed that Prabhjot Singh was a contributor to the DNA found on the gun.

A baseball cap and cellphone were recovered outside the Benning Road store after the robbery. Subsequent testing revealed that Trotter was a major contributor of the DNA found on the cap, with a random match probability on the order of 1 in 220 quintillion. The cellphone bore Trotter's phone number, and phone records showed considerable contact with Pee, including a number of calls in the hours preceding the Minnesota Avenue and Benning Road robberies.

Tate also testified that he met with both Trotter and Pee several days after the Benning Road robbery. Pee told Tate that he knew the police were looking for him; that his girlfriend had been locked up because her car had been used in the robbery; and that he had thrown out his old cellphone and gotten a new prepaid phone to use instead.

Other evidence introduced at trial established that Hattie Bittle, with whom Pee was living at the time of the Benning Road robbery, owned a gold Kia with Maryland tags that matched the partial license plate number recorded by the bus driver who witnessed the robbery. Bittle testified that Pee had the keys to the car on the day of the robbery, and that she was not using the car that day. Her daughter, Melody Bittle, testified that Pee was driving the car that morning and had dropped her off a short distance from the Benning Road store.

On June 21, 2010, four days after the Benning Road robbery, the police stopped Hattie Bittle as she was driving the Kia and brought her to a police station for questioning. Bittle told the police that she assumed Pee had been driving her car on the day of the robbery. She called Pee and asked him to come to the station to clear things up. He agreed to do so, but he never appeared. Melody Bittle, who was with Pee at the time, testified that when he heard that her mother was being questioned about "her car being in some type of incident" the previous week, he acted shocked, packed his bags, and left the apartment without saying anything. He never returned.[1]

---

[1] Sha'Ron Edmond testified that Pee called her on June 21, 2010, and asked if he could stay at her house because his girlfriend had caught him cheating. While he was staying with Edmond, Pee did not go to work, and he instructed her that if anyone called for him, she should say she had not seen him.

## II.

Appellants present several claims of error. Pee argues that the trial court erred in refusing to suppress a statement obtained from him by police in violation of *Edwards v. Arizona*,[2] in denying his motion to sever his trial from Trotter's, and in failing to rule *sua sponte* that the Minnesota Avenue and Benning Road offenses were improperly joined in the indictment. Pee and Trotter both complain of prosecutorial improprieties in closing argument. Finally, Trotter argues that the court erred in allowing the government to introduce unduly prejudicial evidence of the eye injury Prabhjot Singh sustained when he was shot in the head.

We conclude that appellants are not entitled to relief on these claims.

### A. Pee's Motion to Suppress

#### 1. Background

On June 24, 2010, Pee was arrested for the Benning Road robbery and murder. He initially waived his *Miranda* rights and was questioned by Detectives

---

[2] 451 U.S. 477 (1981).

Credle and Richmond. The questioning stopped when Pee asserted his Fifth Amendment right to counsel. Before he did so, Pee acknowledged having had the keys to Hattie Bittle's gold Kia on the day of the robbery. When pressed to explain how he could have been seen in the Kia near Benning Road that morning, Pee said Trotter called him and asked to be picked up at his girlfriend's house, which was nearby.

Five months later, on November 23, 2010, while Pee was still in pretrial detention (housed in the general population units of the D.C. Jail and the local Correctional Treatment Facility), he was arrested on a warrant for the Minnesota Avenue robbery and questioned by Detectives Credle and Sepulveda. Pee waived his *Miranda* rights including his right to counsel and agreed to answer their inquiries.

During the interview, Pee brought up the Benning Road murder. The detectives pursued the subject with him, and Pee answered some of their questions about it while refusing to answer others. Pee again explained that Trotter had called him on June 17 and asked to be picked up near Benning Road. Pee added that he thought Trotter was "beefing" with some other men, and that when he arrived to get him, Trotter was accompanied by a second individual. In response to

the detectives' questions, Pee also confirmed that he was left-handed. At some point, Pee said he wanted his lawyer present for any further questioning, and the interview ended.

Prior to trial, Pee moved to suppress his November 23 statement. Relying on *Edwards v. Arizona*, he argued that the detectives had obtained the statement in violation of his Fifth Amendment rights by resuming his interrogation after he had invoked his right to counsel on June 24. The trial court rejected this argument. On the authority of *Maryland v. Schatzer*,[3] the court ruled that the November interrogation was permissible in view of the length of time Pee had been in pretrial detention after having asserted his right to counsel, his access to counsel in the interim, and his valid waiver of his *Miranda* rights at the outset of the November interrogation.

At trial, Pee's admissions to the detectives on June 24 and November 23, redacted to protect Trotter's confrontation rights,[4] were admitted in evidence against him as part of the government's case.

---

[3] 559 U.S. 98 (2010).

[4] *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *Thomas v. United States*, 978 A.2d 1211, 1224 (D.C. 2009).

## 2. Analysis

We examine the denial of a motion to suppress a statement "to ensure that the trial court had a substantial basis for concluding that no constitutional violation occurred" and review the trial court's legal conclusions *de novo*.[5] If we conclude that the trial court erred and admitted the appellant's statement in violation of his Fifth Amendment rights, we must reverse the conviction unless we are persuaded that the error was harmless beyond a reasonable doubt.[6]

The Supreme Court held in *Edwards* that "it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel."[7] When a defendant has invoked his right to counsel under the Fifth Amendment, "a valid waiver of that right cannot be established by showing only that [the suspect] responded to further police-initiated custodial interrogation even if he has been advised of his rights."[8] Once a suspect asserts his right to counsel, there is a presumption "that any

---

[5] *Morris v. United States*, 728 A.2d 1210, 1215 (D.C. 1999).

[6] *Chapman v. California*, 386 U.S. 18, 24 (1967).

[7] 451 U.S. at 485.

[8] *Id*. at 484.

subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the inherently compelling pressure [of custodial interrogation] and not the purely voluntary choice of the suspect."[9]  A statement thereby elicited from the suspect is inadmissible at trial in the government's case-in-chief.[10]

In subsequent cases, the Supreme Court went on to hold that the *Edwards* presumption applies even if "the police-initiated interrogation following a suspect's request for counsel occurs in the context of a separate investigation,"[11] and "whether or not the accused has consulted with his attorney" in the interim.[12]

Under some circumstances, however, the passage of time between the suspect's assertion of his right to counsel and the re-initiation of his interrogation may operate to dispel the presumption of coercion.  In *Maryland v. Shatzer*, the Supreme Court held that the *Edwards* presumption does not apply if the suspect was released from custody after he asked for an attorney and at least 14 days then

---

[9] *Arizona v. Roberson*, 486 U.S. 675 (1988).

[10] *Edwards v. Arizona*, 451 U.S. at 487.

[11] *Roberson*, 486 U.S. at 682.

[12] *Minnick v. Mississippi*, 498 U.S. 146, 153 (1990).

went by before the police initiated the re-interrogation.[13]  The Court further held that if the suspect was serving a sentence of incarceration at the time he terminated the initial interrogation by invoking his right to counsel, he is deemed to have been released from custody for these purposes when he was returned to the general prison population.[14]

In the present case, the government has argued that because Pee invoked his right to counsel in June 2010 and was not interviewed again by the police until five months later, his re-interrogation was within the 14-day *Schatzer* exception to the *Edwards* rule.  In order for the 14-day period to begin to run, however, Pee had to be released from custody.  That did not occur—Pee remained incarcerated *pending trial* on the charges against him without a break for the entire five months from his initial interrogation on June 24 to his re-interrogation on November 23.  Unlike the suspect in *Schatzer*, Pee was not serving a sentence of imprisonment when he

---

[13] 559 U.S. 98, 110 (2010).

[14] *Id*. at 113.  "At the time of [Shatzer's] attempted interrogation, [he] was already serving a sentence for a prior conviction."  *Id*. at 114.  He was incarcerated in "medium-security state correctional facilities" before and after the attempted interrogation.  *Id*.  The Court declared that "[t]he 'inherently compelling pressures' of custodial interrogation ended when he returned to his normal [prison] life."  *Id*.

terminated the initial interrogation by asserting his right to counsel.[15] The trial court concluded that any differences in the conditions between pretrial detention in Pee's case and the "imprisonment imposed upon conviction of a crime" in the *Shatzer* case[16] are not legally significant. In view of the Supreme Court's reasoning in *Shatzer*, we cannot agree with this conclusion.

In *Shatzer*, the Supreme Court considered whether post-conviction incarceration "exerts the coercive pressure that *Miranda* was designed to guard against."[17] In holding that such incarceration is not equivalent to custody for *Miranda* purposes, the Court reasoned that when convicted prisoners, who have asserted their right to counsel during an interrogation, are returned to "their accustomed surroundings and daily routine[,] they regain the degree of control they had over their lives prior to the interrogation."[18] Furthermore, the Court emphasized, their detention "is relatively disconnected from their prior willingness

---

[15] The record reveals that Pee had been incarcerated previously in the District of Columbia and Virginia on various felony charges, the last of which was a 1997 three-year term of incarceration for carrying a concealed weapon. The record shows no incarcerations from 2000 to the time of his arrest in 2010 for the crimes charged in this case.

[16] *Id*.

[17] *Id*. at 112.

[18] *Id*. at 113.

to cooperate in an investigation. The former interrogator has no power to increase the duration of incarceration, which was determined at sentencing."[19] The Court contrasted such convicted prisoners with defendants "whose continued detention as suspects rested with those controlling their interrogation, and who confronted the uncertainties of what final charges they would face, whether they would be convicted, and what sentence they would receive."[20] Thus, the *Shatzer* Court emphasized "the vast differences between *Miranda* custody and incarceration pursuant to conviction."[21]

Pee, as we have said, was not serving a sentence of imprisonment at the time of his first interrogation. At the conclusion of that interrogation, he did not return to his "accustomed surroundings and daily routine," and his continued detention was not "relatively disconnected" from the questioning he had undergone. Rather, like the defendants in *Edwards*, *Roberson*, and *Minnick*, and unlike the defendant in *Shatzer*, Pee remained a suspect who was detained pretrial on the charges about

---

[19] *Id.*

[20] *Id.* at 114.

[21] *Id.*

which he had been interrogated. His circumstances were essentially what the *Shatzer* Court described as the "paradigm *Edwards* case":

> a case in which the suspect has been arrested for a particular crime and is held in uninterrupted pretrial custody while that crime is being actively investigated. After the initial interrogation, and up to and including the second one, he remains cut off from his normal life and companions, thrust into and isolated in an unfamiliar, police-dominated atmosphere, where his captors appear to control his fate.[22]

For these reasons, we conclude that Pee's lengthy pretrial detention continued to "exert[] the coercive pressure that *Miranda* was designed to guard against."[23] As there was no break in Pee's custody, his re-interrogation did not fall within the exception to *Edwards* recognized in *Shatzer*.

We therefore conclude that Pee's November 23, 2010, statement to police was admitted against him at trial in contravention of *Edwards*. We are satisfied, however, that the error was harmless beyond a reasonable doubt. The redacted statement contained almost no information that was not otherwise presented to the

---

[22] *Id*. at 106 (internal quotations and citations omitted).

[23] *Id.* at 112. *See also Minnick*, 498 U.S. at 153 (recognizing that "the coercive pressures that accompany custody . . . may increase as custody is prolonged").

jury.[24]  Indeed, the November statement was mostly just a reiteration of Pee's earlier June statement to police—in both statements he acknowledged driving the gold Kia in the vicinity of the Benning Road robbery on the morning it occurred, and claimed in exculpation that he did so because Trotter called him to get a ride. As to that claim, the only additional information Pee furnished the second time around was that he thought Trotter needed his help because he was "beefing" with someone, and that he picked up an unknown man with Trotter.  These additional facts obviously were meant to disassociate Pee from involvement in the Benning Road incident; specifically, to suggest that Trotter's accomplice in the robbery was someone other than Pee.  In her closing argument, the prosecutor did not mention either of Pee's statements to police.[25]

---

[24] *McCoy v. United States*, 890 A.2d 204, 213 (D.C. 2006) (finding harmless error where the trial court admitted defendant's videotaped confession to the crime because it was "entirely cumulative" of other evidence admitted at trial); *Derrington v. United States*, 488 A.2d 1314, 1335 (D.C. 1985) (finding harmless error where "virtually everything" in the officer's testimony about the defendant's confession was otherwise in evidence).

[25] Because Pee's statements were redacted to protect Trotter's confrontation rights, we presume that the jury did not even hear much of what Pee told the police.  The record on appeal does not disclose exactly what redactions were made, however.

Pee's November statement also included his admission that he was left-handed. This was not an insignificant fact, since the videotapes of both robberies showed the shorter, stockier gunman holding his gun in his left hand. The prosecutor cited Pee's left-handedness in closing argument. Pee's admission was not the only evidence of his sinistrality, however. Detective Credle testified that Pee signed his *Miranda* rights waiver card on June 24, 2010, with his left hand.

In any event, even without the tainted admissions by Pee on November 23, "there remains overwhelming evidence" to support his conviction.[26] Andre Tate testified that Pee admitted his involvement in the Minnesota Avenue robbery and made statements implicitly admitting his involvement in the Benning Road robbery as well. Multiple eyewitnesses saw the Benning Road robbers escape in a gold Kia belonging to Pee's girlfriend. Both she and her daughter testified that Pee had the keys to that car and had been driving it that morning, and Pee acknowledged as much when the police questioned him on June 24. Pee's behavior after learning the police had seized the car and wanted to speak to him—he went into hiding and changed his cell phone—demonstrated his consciousness of guilt. The video

---

[26] *Hill v. United States,* 858 A.2d 435, 447 (D.C. 2004) ("[T]he erroneous admission into evidence of an illegally obtained confession is harmless beyond a reasonable doubt when there remains overwhelming evidence to support the jury's verdict.") (internal quotation marks omitted).

evidence of the two robberies showed a robber who matched Pee in stature and other characteristics. Cell phone records showed that Pee was communicating with Trotter in the hours preceding each robbery.

For these reasons, we conclude that the erroneous admission of Pee's November 23, 2010, statement at trial does not entitle him to relief from his convictions.

## B. Pee's Claims of Improper and Prejudicial Joinder

Pee claims that the joinder of the Minnesota Avenue and Benning Road crimes in his and Trotter's indictment was improper. As he did not raise this objection before trial, the claim is subject to the strictures of plain error review.[27] It does not survive that scrutiny. Criminal Rule 8(b) permits joinder of offenses involving more than one defendant if the offenses are based on the same act or transaction or series of acts or transactions.[28] This test is met where, as here, the

---

[27] *Taylor v. United States*, 603 A.2d 451, 455 (D.C. 1992).

[28] Super. Ct. Crim. R. 8 (b); *see Ray v. United States*, 472 A.2d 854, 857 (D.C. 1984). Misjoinder under Rule 8 is an error of law. *Id.*

indictment alleges that the joined offenses were committed as part of a conspiracy.[29]

Pee further claims that the trial court abused its discretion in denying his motion to sever his case from Trotter's pursuant to Criminal Rule 14, which allows the court to grant such relief if it determines that a joint trial would be prejudicial.[30] There is "a strong presumption" that defendants charged with jointly committing a criminal offense will be tried together,[31] and a court should sever them under Rule 14 "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment

---

[29] *Id.* at 858 n.7 ("The conspiracy count links the offenses and creates overlapping issues and proof.") (citing *Schaffer v. United States*, 362 U.S. 511, 512-14 (1960)); *see also Cupo v. United States*, 359 F.2d 990, 992 (D.C. Cir. 1966) (joinder of separate charges proper where "alleged to be parts of the same conspiracy"); *United States v. Carson*, 455 F.3d 336, 373 (D.C. Cir. 2006) (where indictment alleges counts that were overt acts in furtherance of a conspiracy, "[t]his provided the necessary link to satisfy Rule 8(b).").

[30] Super. Ct. Crim. R. 14; *see Scott v. United States*, 619 A.2d 917, 930 (D.C. 1993) ("The disposition of a motion for severance is within the sound discretion of the trial court, and its ruling either way will be reversed only on a showing of an abuse of discretion.").

[31] *Moore v. United States*, 927 A.2d 1040, 1056 (D.C. 2007) (quoting *King v. United States*, 550 A.2d 348, 352 (D.C. 1988)).

about guilt or innocence."[32]  Consequently, to demonstrate an abuse of discretion in the denial of his motion, Pee must persuade us that he suffered "manifest prejudice" from the joinder.[33]

Pee has not made this "demanding showing."[34]  His sole contention is that he was prejudiced because the evidence against Trotter was much stronger than the evidence against him.  But as this court has reiterated on numerous occasions, "a defendant is not entitled to severance merely because the evidence against a codefendant is more damaging than the evidence against him.  Manifest prejudice occurs only where the evidence of a defendant's complicity in the overall criminal venture is *de minimis* when compared to the evidence against his codefendants."[35] The evidence against Pee, which we have highlighted above, was far from *de minimis*.  We agree with the trial court's assessment that there was "still substantial evidence as to Mr. Pee's guilt and insufficient disparity in evidence to really demonstrate any unfairness."  Moreover, because Trotter and Pee were charged

---

[32] *Id.* (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)).

[33] *Id.*

[34] *Harrison v. United States*, 76 A.3d 826, 834 (D.C. 2013).

[35] *Scott v. United States*, 619 A.2d 917, 930 (D.C. 1993) (quoting *Bush v. United States*, 516 A.2d 186, 192 (D.C. 1986)).

with conspiracy as well as with the substantive offenses, much of the evidence against each appellant was admissible against the other.[36] "[W]e see no indication that the evidence was too unwieldy for the jury to keep straight or that jurors were unable to make individual determinations about each appellant's guilt or innocence as to the substantive offenses with which each was charged."[37]

## C. Appellants' Claims of Improper Argument by the Prosecutor

Pee and Trotter both complain of prosecutorial misconduct in closing and, especially, rebuttal argument. We shall begin by addressing whether the trial court erred in denying the defense motions for a mistrial after the prosecutor asserted in her rebuttal argument that defense counsel were trying to distract the jury from considering the evidence because counsel knew the jury would convict their clients. Then we shall address Trotter's additional claims of impropriety.

---

[36] *Castillo-Campos v. United States*, 987 A.2d 476, 492-93 (D.C. 2010).

[37] *Id.* at 493.

## 1. Denial of a Mistrial

In her rebuttal argument, the prosecutor twice impugned defense counsel for trying to distract the jury because counsel knew the jurors would convict Pee and Trotter if they looked at the evidence. The first comment to that effect was the prosecutor's rejoinder to an argument by Pee's attorney that Pee had no motive to rob the check cashing store on Benning Road because he had a job:

> Now, why would he be asking you to look at something there's no evidence in front of you about? What's he trying to do there? He's trying to get you to speculate and he's trying to get you not to look at the evidence. Look at something that's not here because if you're looking at this [a demonstrative chart highlighting the government's evidence], you're going to convict him.

The second comment was in response to an argument by Trotter's counsel that the videotape of the Benning Road robbery was of poor quality and did not allow the robbers or other persons shown in it to be identified:

> Look at your evidence. Anybody who tells you don't look at the evidence, speculate, you know what that is. That's because they know you're going to convict.[38]

---

[38] On appeal, Trotter cites a third rebuttal comment along the same lines: "So what's up with the cane [allegedly used by Pee because he walked with a limp]? What's up with something that did not exist during either one of these robberies? Why mention that? Because if you look at the evidence, you're going

*(continued…)*

Trotter's counsel objected to the latter comment, and the court sustained the objection, telling the jury to "strike that last remark" because it was an "inappropriate argument." After the rebuttal argument concluded, Pee's counsel objected to the former comment and moved for a mistrial. Trotter joined in the motion. In declining to grant a mistrial, the court agreed that the prosecutor's remarks impermissibly suggested what was in the minds of the defense attorneys, but assessed them as an "isolated comment in a lengthy rebuttal and lengthy initial argument" that caused no "real damage" to appellants. Noting that it had already sustained an objection and had told the jury to disregard the second remark, the court decided to emphasize that directive by giving the following additional curative instruction:

> [I]t may have been suggested during the argument that the defendants or their attorneys or both possessed certain beliefs about the evidence, what it did or didn't prove and whether it did or did not prove the guilt of the defendants. And I sustained an objection to that argument because it's inappropriate for an attorney to argue about what they believe the other side believes. And it's inappropriate for you to consider that argument.
>
> In the end, you must decide, and only you must decide, what the evidence has proven in this case. And the

---

*(continued…)*
to convict." Appellants did not cite this comment to the trial court in support of their request for a mistrial or otherwise preserve an objection to it.

arguments of counsel[,] or the beliefs of counsel[,] or the beliefs of counsel about what the other side believes[,] are irrelevant to that consideration. You must make your determination based upon the evidence that's been presented in this case, your assessment of that evidence and your assessment of the credibility of the witnesses[,] and whatever rules of law I tell you you must follow.[39]

The decision whether to grant a mistrial motion in lieu of alternative relief in response to a prejudicial development at trial is committed to the trial court's discretion.[40] We will reverse a discretionary denial of a mistrial only if the trial court's decision "appears irrational, unreasonable, or so extreme that failure to reverse would result in a miscarriage of justice."[41] We are loath to reverse because "[a] mistrial is a severe remedy—a step to be avoided whenever possible, and one to be taken only in circumstances manifesting a necessity therefor."[42] To determine whether a mistrial was necessary, we consider:

---

[39] Trotter argues that this curative instruction only told the jury to disregard the single comment to which the court had sustained his objection. We do not agree with that narrow reading of the instruction. We think the court made it clear to the jury that counsel's beliefs were irrelevant and that it should disregard *any* argument about what opposing counsel believed.

[40] *Smith v. United States*, 665 A.2d 962, 967 (D.C. 1995) ("a trial court does not abuse its discretion when prejudice can be cured by an instruction to the jury").

[41] *Coleman v. United States*, 779 A.2d 297, 302 (D.C. 2001) (quoting *Bragdon v. United States*, 668 A.2d 403, 405 n.2 (D.C. 1995)).

[42] *Peyton v. United States*, 709 A.2d 65, 69 (D.C. 1998).

the gravity of the misconduct, the relative strength of the government's case, the centrality of the issue affected, and any mitigating actions taken by the court, all while giving due deference to the decision of the trial judge, who had the advantage of being present not only when the alleged misconduct occurred, but through the trial.[43]

As the trial court recognized, the prosecutor's challenged remarks were not proper. It certainly was permissible for the prosecutor to refute the arguments of defense counsel and urge the jury not to let those arguments distract it from considering the probative evidence. But referring to defense counsel's imputed motives and beliefs was not the way to do it. Just as "it is impermissible for the prosecutor to directly suggest to the jury that defense counsel does not believe his own client,"[44] so too it is impermissible to suggest that opposing counsel knows or believes the jury will convict his client. Such rhetoric is improper because, among other reasons, it tends to "inject an irrelevant issue into the case; it risks directing the jury away from the evidence."[45]

---

[43] *Bennett v. United States*, 597 A.2d 24, 27 (D.C. 1991).

[44] *(Jerome) Bates*, 403 A.2d 1159, 1163 (D.C. 1979); *see also Powell v. United States*, 455 A.2d 405, 409 (D.C. 1982).

[45] *(Jerome) Bates*, 403 A.2d at 1163.

Nevertheless, we are not persuaded that the challenged comments necessitated a mistrial for either appellant. While the rhetoric was inappropriate, it was not egregiously so. It did not go "to the very essence of appellant's defense,"[46] nor did it direct the jury away from the evidence before it. The thrust of the comments was that the jury needed to focus on that evidence and not on speculative or irrelevant matters raised by defense counsel. The prosecutor did not urge the jury to base its decision on defense counsel's supposed assessment of the evidence (or on counsel's supposed assessment of appellants' culpability), and we do not think the jury understood that to be her argument. In addition, having reviewed the rebuttal argument ourselves, we agree with the trial court that the two comments were isolated remarks in a lengthy rebuttal; and we would add that the tenor of the comments did not reflect the overall character of the prosecutor's arguments, which were very much focused on discussing the evidence and the weaknesses in defense counsel's arguments for the existence of reasonable doubt. And especially given the trial court's strong and timely admonitions, we are confident the jury understood that the supposed beliefs of defense counsel were irrelevant. The trial court "was in a position to evaluate" the impact of the prosecutor's objectionable comments and the likely efficacy of a curative

---

[46] *Powell*, 455 A.2d at 411.

instruction, and we "attach considerable significance" to its assessment that a mistrial was unwarranted.[47]

Given, also, the strength of the evidence against appellants, we are confident that the jury found it easy to obey the court's instructions and did not rely on what defense counsel supposedly must have believed. We have already commented on the strength of the evidence against Pee. The evidence against Trotter was even stronger. Among other things, his cellphone and his hat (with his DNA) were recovered outside the check cashing store on Benning Road, where Trotter grappled with and shot Prabhjot Singh; the checks stolen from the store on Minnesota Avenue were recovered from Anthony Evans, who testified that he received them from Trotter; Andre Tate testified that Trotter admitted committing both robberies and shooting Singh; and Tate turned the murder weapon over to the police, explaining that Trotter had given it to him and asked him to conceal it.

In sum, considering the nature of the challenged comments, the gravity of the impropriety, the strength of the government's case, the mitigating actions taken by the trial court, and the deference we owe the trial court's first-hand assessment

---

[47] *Sherer v. United States*, 470 A.2d 732, 743 (D.C. 1983).

of the situation, we hold that the court did not abuse its discretion in denying appellants' motions for a mistrial.

## 2. Trotter's Claim of Improper Argument

In addition to the statements considered by the trial judge in the motion for a mistrial, appellant Trotter argues that several other comments made by the prosecutor, mainly during her rebuttal, also were improper, and that the cumulative effect of all the improprieties was so prejudicial as to entitle him to a new trial.

The principles that govern our review of Trotter's claims are well-settled. Briefly stated, if the challenged comments were in fact improper, and if objection to them was preserved, we will affirm only if we are satisfied that the comments were not substantially prejudicial; while if there was no objection, plain error must be shown to obtain relief. Our evaluation takes into consideration the context in which the comments were made, the gravity of the improprieties, their relationship to the issue of guilt, the effect of any corrective action taken by the court, and the strength of the government's case.[48]

---

[48] *See Finch v. United States*, 867 A.2d 222, 225-26 (D.C. 2005).

Trotter cites as objectionable numerous comments made by the prosecutor in addition to the ones that led appellants to move for a mistrial. These included comments that, Trotter argues, (1) suggested defense counsel had employed a strategy lawyers are "taught" to use in losing cases; (2) vouched for the prosecutor's own trustworthiness; (3) disparaged defense counsel for "slamming" the testifying detectives, presenting expensive expert testimony of little probative value, and making fun of Andre Tate for being a drug addict. By these improper means, Trotter charges, the prosecutor engaged in a "calculated attempt to improperly influence the jury by calling into question defense counsel's character and casting legitimate defense actions as underhanded tricks intended to deceive." Trotter also asserts that the prosecutor improperly played on the jury's emotions by characterizing the pistol whipping of Chakroborty and Prithvi Singh as "degrad[ing]" and "abus[ive]," and by describing how Prabhjot Singh was killed by "one gunshot wound to the left eye exploding his eyeball, [and] going through his brain."

There was no contemporaneous objection to some of the comments that Trotter identifies.[49] Furthermore, we do not agree that all, or even most, of the

---

[49] For instance, appellants did not object to the prosecutor's use of the word "slamming."

challenged comments actually were improper. We certainly agree that "[a] trial is not a referendum on the conduct of the attorneys, and disparagement of opposing counsel is improper."[50] But much of what Trotter calls disparagement of defense counsel was within the bounds of fair comment on the defense argument and evidence.[51] (The principal exception, a remark implying that defense counsel had "ma[de] fun of somebody who's an addict," brought an immediate admonishment by the trial court that "[t]here's nobody who is making fun of anybody for their addiction.") Additionally, what Trotter calls an attempt to inflame the jury was in fact relatively mild and restrained commentary that was "amply supported by the evidence."[52] "In making its case to the jury, the government is not required to

---

[50] *(Ronald) Bates v. United States*, 766 A.2d 500, 508 (D.C. 2000).

[51] The prosecutor's assertion that Trotter's counsel had "slammed" the detectives for slipshod police work is an example. "Slammed" was not an unfair word to use in referring to defense counsel's scathing criticisms of the detectives for "just accept[ing] Mr. Tate and sponsor[ing] his lies and his nonsense," and of one detective for offering a "ridiculous excuse" for having overlooked Trotter's cellphone. (We would add that the prosecutor's statement that defense counsel had "slammed" the detectives was comparable, in our view, to defense counsel's sarcastic assertions that the prosecutor had "pooh-poohed" certain defense witnesses.)

[52] *Perez v. United States*, 968 A.2d 39, 81 (D.C. 2009); *cf. Chatmon v. United States*, 801 A.2d 92, 101 (D.C. 2002). In the next section of this opinion, we discuss the court's ruling admitting the evidence of Prabhjot Singh's eye injury over defense objection.

deliver a dispassionate presentation of sterile facts. The gritty reality of the crime, including its human toll, is relevant to the jury's consideration."[53]

While we think it unnecessary to discuss every comment challenged by Trotter, two of them warrant further attention. First, Trotter complains that the prosecutor made a "patently improper" argument that set the tone of what followed when she began her rebuttal by saying:

> When I was in law school, they taught me if the facts are on your side, you argue the facts. If the facts aren't on your side, you argue the law. If the law and the facts aren't on your side, deny, deny, deny. Now what did you hear from the defense yesterday?[54]

We suspect rhetoric such as this is not infrequently heard in Superior Court, and we would not wish to overstate either its effectiveness or its impropriety, but we agree with Trotter that it is inappropriate. The prosecutor was entitled to highlight what she considered the weaknesses in the defense argument, but it was not proper to say, as this rhetoric also did, that the argument was one lawyers are taught to make when they have a losing case. "That a certain defense theory is unsupported

---

[53] *Chatmon*, 801 A.2d at 100.

[54] Pee's defense counsel objected to this statement, but the trial court overruled the objection.

by the evidence in a particular trial [or is otherwise flawed] does not give the prosecutor carte blanche to suggest that the theory advocated is commonly recognized as a dubious defense which implies guilt as much as innocence."[55] Such rhetoric, like the comments that triggered the motions for a mistrial, implicitly invites the jury to reject a defense argument and infer the defendants' guilt on an improper basis rather than on the merits of the argument and the evidence presented. In short, as the government concedes on appeal in its brief, the prosecutor's attempt at a "catchy preface" to her rebuttal argument would have been "better left unsaid." It was a faux pas, albeit not a grievous one inasmuch as the main point was simply that the defense arguments were short on the facts and the law.

Turning to the second comment we wish to discuss, we do not agree with Trotter that the prosecutor improperly vouched for her own trustworthiness. The remark of which Trotter complains was provoked by an accusation levied against the prosecutor by Trotter's counsel, and we cannot fault the prosecutor's comeback.

---

[55] *Curry v. United States*, 520 A.2d 255, 267 (D.C. 1987); *see also State v. Griese*, 565 N.W.2d 419, 427 (Minn. 1997) ("it is improper to . . . suggest that a defense offered is some sort of standard defense offered by defendants 'when nothing else will work.'") (internal citation omitted).

Several eyewitnesses called in the government's case-in-chief initially described the robber later identified as Trotter as being in his twenties or early thirties—a helpful fact for the 58-year-old Trotter. At trial, however, these witnesses testified that they really could not tell the robber's age. Addressing this in her closing argument, Trotter's counsel asserted that "Ms. Sines [the prosecutor] managed to get them to say" they were "traumatized and all these other excuses" for originally having said the robber was a young man. In her rebuttal, the prosecutor responded to this as follows:

> Ms. Harvey [Trotter's counsel] told you, Ms. Sines managed to get them to say they couldn't tell the age when they testified in here. The only thing you can infer about Ms. Sines managing to get witnesses to say something is that somehow, some way, the government coached some witnesses. And let me clear this up at the outset, don't you ever tolerate any prosecutor that would do something like that. . . .[56] That's wrong, that's sleazy and that certainly isn't justice. What I'm asking you to do . . . . is evaluate [the witnesses'] testimony with those tools Judge Fisher is going to give you, and I'm going to ask you to draw your own conclusions about whether any of those people were coached by anyone, by anyone.

Trotter argues that this statement was improper self-vouching, but we think it was a reasonably restrained (if understandably indignant) response to the (unverified)

---

[56] At this point, the court overruled an objection by Trotter's counsel.

charge that the prosecutor had "managed" the eyewitnesses' testimony. The prosecutor "was not obliged to remain silent in the face" of such an accusation,[57] and she made no improper representations in her rejoinder about her own behavior or personal trustworthiness.

A criminal conviction "is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements must be viewed in context."[58] We have endeavored to do so here, and we are satisfied that the cumulative effect of all the challenged comments, which Trotter characterizes as essentially an assault on defense counsel's character and tactics, did not "rise to the level of 'substantial prejudice'" to Trotter's (or Pee's) defense.[59] The inappropriate and questionable comments were fewer in number and less significant than Trotter maintains, and certainly not as flagrant or as closely related to the issue of guilt as improprieties such as arguing material facts not in evidence, misstating a key point

---

[57] *Dyson v. United States*, 450 A.2d 432, 442 (D.C. 1982); *see also Tillman v. United States*, 487 A.2d 1152, 1154 (D.C. 1985) ("the prosecutor acted properly by pointing out in rebuttal that counsel's theory was not supported by any evidence"); *Watts v. United States*, 449 A.2d 308, 313 (D.C. 1982) ("the prosecutor's comment was a response to defense counsel's speculation . . . and it is likely that the jury perceived it as such").

[58] *United States v. Young*, 470 U.S. 1, 11 (1985).

[59] *Powell v. United States*, 455 A.2d 405, 411 (D.C. 1982).

of the applicable law, or appealing directly to the prejudices or passions of the jury.[60] As we have noted, the evidence against both appellants was strong, the prosecutor's arguments were focused primarily and appropriately on that evidence, and the trial court took effective corrective actions.[61] We cannot conclude that the trial court abused its discretion in responding to appellants' objections to the government's arguments, or that those arguments deprived Trotter (or Pee) of a fair trial.

---

[60] *See, e.g., Brown v. United States*, 766 A.2d 530, 541-46 (D.C. 2001).

[61] To recap, during the prosecutor's rebuttal argument, the court instructed the jury to disregard a comment that defense counsel thought the jury would convict their clients, and the court expressly disapproved a suggestion that defense counsel had mocked Andre Tate because of his drug addiction. In addition, the court thereafter gave the strong curative instruction quoted earlier. We also take note of the court's instructions at the beginning and end of trial that the lawyers' arguments were not evidence, that the jury must follow the court's instructions about the law, and that the jury is the sole judge of the facts and the verdict is their exclusive responsibility. We have no reason to doubt the jury's ability to follow the instructions it received. *Cf. Clayborne v. United States*, 751 A.2d 956, 970 (D.C. 2000) ("[J]urors do not accept uncritically everything a prosecutor says in argument."); *Foote v. United States*, 108 A.3d 1227, 1239 (D.C. 2015) (absent "extraordinary" circumstances, "we adhere to the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions.").

### D. Trotter's Objection to Evidence of Prabhjot Singh's Eye Injury

Trotter contends that evidence of the damage to Prabhjot Singh's eye should have been excluded because it was inflammatory and had no legitimate probative value inasmuch as the evidence was not necessary to prove the cause of Singh's death. We review the trial court's decision to admit the evidence for abuse of discretion: "[W]e have recognized that the evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great degree of deference to its decision."[62]

The evidence came in through the medical examiner, Dr. Colvin, who showed the jury an autopsy photograph of Singh's head wound and explained:

> There are also small abrasions over the right eyelid. This bottom portion here of his lower eyelid shows the part of the gunshot wound that is received. The rest of it was through his eyes. And eyes don't do well when they are hit with bullets. So it is like a—almost like a ball of liquid, so it doesn't hold together with a gunshot wound. And so you have this smaller portion where the gunshot wound is and then around that you should see the stippling.

In answer to a follow-up question, Dr. Colvin testified:

---

[62] *Daniels v. United States*, 738 A.2d 240, 253 (D.C. 1999).

> As I said, when it hits the globe, it basically causes it to explode in a sense because it is full of water, in a sense. And so gunshot wounds, they don't just pass through. They—the thing with gunshot wounds is they release a lot of energy to it. So since you are hitting something like a small water balloon, it doesn't hold its own; it explodes.

The trial court concluded that the probative value of this evidence was not substantially outweighed by the risk of prejudice.[63] We perceive no abuse of discretion in this ruling. It was the government's burden to prove the cause of Singh's death, and the fact that Trotter did not dispute it did not change that burden.[64] Even though the ultimate cause of Singh's death was the bullet in his brain rather than the immediately preceding trauma to his eye, the eye injury evidence was not irrelevant. It was relevant because it was part of the chain of causation that linked Trotter's firing of his weapon to Singh's death.

---

[63] This court has adopted Federal Rule of Evidence 403, which requires the judge to "assess whether the probative value of the evidence is substantially outweighed by the danger of undue prejudice." *Blackson v. United States*, 979 A.2d 1, 10 (D.C. 2009) (internal citation and quotes omitted).

[64] *Old Chief v. United States*, 519 U.S. 172, 186-87 (1997) ("[A] criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it."); *see also Pittman v. United States*, 375 A.2d 16, 19 (D.C. 1977) (that the defendant did not contest murder's location did not make on-scene photos of decedent inadmissible if they "were in some way relevant").

The most that can be said is that, because there was no dispute as to how Singh died, but only as to the identity of his murderer, the probative value of the eye injury evidence may have been comparatively slight. We cannot say, however, that the unfair prejudicial impact of the evidence substantially outweighed its probative value. The government is not required to sanitize probative evidence or cleanse it of all emotional impact.[65] "Some types of cases, particularly those involving tragic death or injury, have an inherent emotional impact."[66] The testimony about the eye exploding from the impact of the bullet was neither overemphasized nor overly graphic; nor did the prosecutor overdramatize the eye injury when she briefly mentioned it in closing argument. We are not persuaded that the jury's ability to weigh the evidence fairly and dispassionately was compromised.[67]

---

[65] *Powell v. United States*, 485 A.2d 596, 599 (D.C. 1984); *Irick v. United States*, 565 A.2d 26, 36 (D.C. 1989).

[66] *Dixon v. United States*, 565 A.2d 72, 76 (D.C. 1989).

[67] *Cf. Gethers v. United States*, 684 A.2d 1266, 1273 (D.C. 1996) ("Considering the cases in which we have repeatedly and consistently upheld the admission of gruesome photographs, we can find no abuse of discretion here in the admission of [the witness's] testimony."). *See also Johnson v. United States*, 613 A.2d 888, 895 (D.C. 1992) (upholding admission of photographs showing victim who had been burned with a hot iron before being raped); *Faunteroy v. United States*, 413 A.2d 1294, 1299 (D.C. 1980) (upholding admission of photographs showing the emaciated body of a two-month-old child who had been killed through neglect).

## VI.

For the foregoing reasons, we affirm appellants' convictions and remand for the merger of certain offenses.[68]

*So ordered.*

---

[68] We understand the parties to be in agreement as to which counts of conviction are subject to merger.