*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-CF-0349

GARY N. PROCTOR, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(2015-CF1-010128)

(Hon. Danya A. Dayson, Trial Judge)

(Argued May 15, 2025            Decided September 18, 2025)

*Lakeisha F. Mays*, with whom *Marisa S. West*, *Rimsha Syeda*, and *Ausjia Perlow* were on the brief, for appellant.

*Chrisellen R. Kolb*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney, *John P. Mannarino*, *Alicia Long*, and *Michael E. McGovern*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, SHANKER, *Associate Judge*, and CROWELL, *Associate Judge*, *Superior Court of the District of Columbia*.[*]

---

[*] Sitting by designation pursuant to D.C. Code § 11-707(a) (2001).

CROWELL, *Associate Judge*: This appeal comes before the court on Gary Proctor's challenge, arguing that the Superior Court erred in several respects during his first-degree murder trial.  At trial, the jury convicted Mr. Proctor of first-degree premeditated murder while armed, possession of a firearm during a crime of violence, unlawful possession of a firearm, and carrying a pistol without a license.  During the trial, the jury received voluminous evidence indicating Mr. Proctor's guilt, including, but not limited to: (1) multiple bystanders testifying that the decedent, Jerome Diggs, identified Mr. Proctor as the shooter; (2) an eyewitness and cell site data placing Mr. Proctor near the site of the murder; (3) that a pistol magazine and ammunition were found in Mr. Proctor's room consistent with ballistics evidence discovered at the scene; and (4) security camera footage showing Mr. Proctor, the day after the murder, swapping out his old phone—containing photos of a pistol—for a new one.

For the reasons articulated below, we disagree with Mr. Proctor on each of the ten challenges he raises on appeal and affirm his convictions.  However, Mr. Proctor will have thirty days following the issuance of this decision to allow him to file a motion pursuant to D.C. Code § 23-110 for ineffective assistance of counsel for which he has not yet had the opportunity to develop the record during the pendency of his direct appeal.

## I.    Factual Background

### A.    The Call

In July 2015, Jerome Diggs was shot multiple times and later died of his injuries. The shooting was first reported when his sister, Diane Offutt, received a call from Mr. Diggs while at work.  Immediately after she answered the phone, Mr. Diggs informed her that "little Gary"—their name for Mr. Proctor—had shot him "about four or five times."  When Ms. Offutt asked Mr. Diggs why he had called her instead of the police or an ambulance, Mr. Diggs responded, "I just want somebody to know what happened to me."  From the sound of his voice—"soft," "hurting," and "in pain"—Ms. Offutt felt that Mr. Diggs "knew that he was going to die."  Indeed, Mr. Diggs told her that he "didn't think he was going to make it."  Shortly thereafter, the line went dead.

Ms. Offutt then dialed 911, directing emergency services to send an ambulance to Mr. Diggs's location.  Unable to leave her work, she also called her brother Kevin Offutt and sent him to the scene in her stead.  Although she was able to hold it together on the call, Ms. Offutt "felt like [she] was going to lose it" and like she "couldn't breathe."  Once the call ended, she "fell apart"—"screaming," "crying," and became "hysterical."  Forty-five minutes later (and after she was relieved at work), she rushed to Mr. Diggs's house.

**B.     The Shooting Scene**

Multiple witnesses arrived at the scene after the shooting.  Myia Crews—Mr. Diggs's neighbor—was watching television in her house when she heard gunshots. Shortly after the gunshots ceased, Ms. Crews's father went outside and then returned, informing Ms. Crews that Mr. Diggs had been shot.  Ms. Crews rushed to Mr. Diggs's home and found him wounded and lying on the threshold of his home's back door.

As Ms. Crews began her attempt to staunch Mr. Diggs's bleeding with a towel and pillow, Mr. Diggs repeatedly stated that he was "not going to make it."  While talking with Mr. Diggs to keep him awake, Ms. Crews attempted to reach Mr. Diggs's girlfriend, Crystal Johnson, through Ms. Johnson's cousin, Kedewee.  In response, Kedewee himself came to the scene and asked Mr. Diggs who shot him, to which Mr. Diggs responded, "Little Gary, Little Gary, Little Gary."  Because Mr. Diggs was at this time lying with his head in Ms. Crews's lap, she also heard this accusation "clearly."

The above events attracted the attention of Mr. Diggs's neighbor Lynette Gibson.  When Ms. Gibson arrived at the scene, she saw her son, Darnell Gibson, and asked him what had happened.  In response, according to Ms. Gibson, her son told her that he saw Little Gary "running across the street from [Mr. Diggs's] house."

### C.    The Investigation

Paramedics took Mr. Diggs to the hospital, where he was pronounced dead that evening, as a result of seven gunshot wounds.

While Mr. Diggs was being treated, police officers began their own investigation.  They first searched Mr. Diggs's home and found eight .40 caliber cartridge cases and two bullets spread across multiple locations, including the threshold of his front door, his front living room area, his laundry area, and the floor of his kitchen.  The cartridges were Hornady brand, Smith and Wesson design, and nickel-plated.  A forensic analysis of the cartridges indicated that all were fired from the same firearm, and an analysis of a bullet found at the scene showed that it was fired by the same firearm used to fire the bullets that would later be recovered from inside Mr. Diggs's body.  Forensic investigators were ultimately able to narrow the type of firearm used to one of four models, all manufactured by Smith and Wesson.

Relying on Mr. Diggs's last words, officers next searched the home where Mr. Proctor lived with his mother.  In an upstairs bedroom, they found mail belonging to Mr. Proctor and a street sign reading "Little Gary's Avenue."  In addition, they found a nylon weapons holster, an associated band, and a pistol magazine containing eight live cartridges of the same ammunition found in Mr. Diggs's home.  The magazine

was designed for use with a Smith and Wesson Sigma series pistol—one of the four models that could have been used to kill Mr. Diggs.

Officers also learned that the day after Mr. Diggs's murder, Mr. Proctor visited a Boost Mobile phone store, and, in a hurry, swapped out his old phone for a new one. On Mr. Proctor's old phone, officers found multiple, deleted photographs showing guns and magazines, each of which had been taken using the phone's camera. Four of the photos depicted a Smith and Wesson Sigma series pistol, two of those four showed a magazine matching the one recovered from Mr. Proctor's bedroom, and one of the four contained an unidentified individual wearing a firearm holster similar to that recovered in Mr. Proctor's bedroom.

Officers used data from Mr. Proctor's phone to approximate his location on the day of the murder. Based on calls made by Mr. Proctor around the time of the shooting, officers determined that he was in an area that included both the murder scene and the house at which he stayed with his mother (located across the street from Mr. Diggs's home). Officers also learned that at 4:40:55 p.m. that day, Mr. Proctor called his father, Gary Offutt, and travelled to his father's house. Notably, Mr. Diggs's final call to his sister, Ms. Offutt—made in the minutes after he was shot—took place at 4:41:51 p.m. Under the government's theory, therefore, Mr. Proctor called his father and fled to his father's house immediately after shooting Mr. Diggs.

**D.     Motive Evidence**

As officers continued their investigation, they sought evidence regarding why Mr. Proctor might have wanted Mr. Diggs dead.  They ultimately uncovered evidence of three possible motives.

First, officers discovered during a search of Mr. Proctor's vehicle a piece of paper containing a list of names each associated with a number.  One of the names was "Diggs" and it had written next to it "120.00."  Based on other evidence suggesting that Mr. Proctor dealt drugs to Mr. Diggs and others in the neighborhood, the government suggested to the jury that Mr. Diggs owed Mr. Proctor a drug-related debt.

Second, and relatedly, officers learned that a few weeks before the murder, Mr. Diggs ended a previous arrangement he had with Mr. Proctor whereby he allowed Mr. Proctor to sell drugs out of Mr. Diggs's house.  This arrangement did not end amicably: Mr. Diggs withdrew from it during an angry argument in which both Mr. Diggs and Mr. Proctor yelled at one another.

Finally, and most importantly for this appeal, about two weeks before Mr. Diggs's murder, Mr. Diggs and Mr. Proctor were both present at a cookout at which a fight broke out centered around Ronnell Offutt—Ms. Offutt's son.  During this fight, multiple men—including Mr. Proctor and his father—hit Ronnell with objects

described by different witnesses as bats, canes, sticks, pipes, or poles. Seeing this, Mr. Diggs attempted to intervene on Ronnell's behalf and was struck.

As a result of the fight, Ronnell ended up in the hospital with visible knots on the back of his neck and head. When Ms. Offutt saw the results of the attack on Ronnell, she sent a series of threatening texts to Mr. Proctor's father in which she accused him and his family of committing multiple criminal acts. According to Ms. Offutt, she sent these texts in an effort to prevent Mr. Proctor's father from taking further action to harm her family.

In response to the text messages, Mr. Proctor's father filed suit in the Superior Court seeking a civil protection order (CPO) against Ms. Offutt. Ms. Offutt was served with the CPO filing four days before Mr. Diggs's murder. When Ms. Offutt told Mr. Diggs about an upcoming hearing related to the CPO, he told her that he would come to court on her behalf. According to Ms. Offutt, Mr. Diggs also informed her that Mr. Proctor had offered him money in exchange for his promise not to testify at the CPO proceedings, which Mr. Diggs declined. Mr. Diggs explained that he was going to stand by her because Mr. Proctor and his family members were the "ones who hurt [him] and [her] son." Before Mr. Diggs had the chance to testify, he was murdered.

## II. Procedural Background

### A. Relevant Pretrial Proceedings

After its investigation, the government charged Mr. Proctor with first-degree premeditated murder while armed, possession of a firearm during a crime of violence or dangerous offense, unlawful possession of a firearm, carrying a pistol without a license, and unlawful possession of ammunition.

The trial court subsequently made three pre-trial rulings relevant to this appeal. First, Judge Florence Pan, after Mr. Proctor moved to have her recused based on allegedly disrespectful comments she made to one of his initial attorneys, denied the motion as moot because the case was set to be reassigned to another judge.

Second, after Judge Pan had been replaced, the trial court allowed the prosecution to admit at trial Mr. Diggs's statements to Ms. Offutt regarding Mr. Proctor's attempt to stop him from testifying at the CPO hearing, finding by a preponderance of the evidence that Mr. Proctor had killed Mr. Diggs in part to prevent him from testifying.

Finally, the trial court admitted a recording of Ms. Offutt's 911 call, which she made after learning from Mr. Diggs that he had been shot, under the excited-utterance exception to the rule against hearsay.

**B. Trial**

At trial, Mr. Proctor repeatedly asked the trial court to order a mistrial. These requests were grounded in two forms of alleged misconduct: references to his prior incarceration and an improper closing argument by the government.

First, the trial court declined to order a mistrial in the face of three references to Mr. Proctor's prior incarceration. In the first such reference, one witness testified that he first met Mr. Proctor after Mr. Proctor had "just came home from some incident of being locked up." Mr. Proctor immediately raised on objection, which the trial court sustained, and moved for a mistrial. The trial court took the motion for mistrial under advisement, asked Mr. Proctor if he would like a limiting instruction (which Mr. Proctor declined so as not to draw attention to the witness's statement), and reminded the government to instruct its witnesses to not reference Mr. Proctor's prior incarceration.[1] After hearing argument on the mistrial motion at the close of the day's proceedings, the trial court denied the motion the following morning and further denied Mr. Proctor's oral motion to reconsider, all without prejudice to a renewed motion at the close of the government's case. The Court reasoned that: (1) the jury had no way of knowing for what crime Mr. Proctor had been incarcerated; (2) it did not appear that the government had intentionally elicited

---

[1] Mr. Proctor acknowledged that he was "certainly not suggesting any bad faith on the part of the [g]overnment."

the challenged statement; (3) that the court had offered a contemporaneous curative instruction and would provide one in its closing instructions; and (4) the jury would have learned no matter what that Mr. Proctor had previously been convicted of a crime when it heard his stipulation to that fact for purposes of the unlawful possession of a firearm charge.

In the second reference to Mr. Proctor's prior incarceration, the government, in an effort to prove that a pistol magazine found in a bedroom belonged to Mr. Proctor, admitted a series of other items found in that bedroom that related to Mr. Proctor.   As part of this sequence, the government admitted and briefly published an exhibit showing one photograph and a portion of another.   The full photograph depicted Mr. Proctor and two other men standing in front of a cinderblock wall.[2]   One man was wearing a light gray t-shirt, gray sweatpants, and white tennis shoes; Mr. Proctor was wearing a white beanie, a khaki button-up shirt, a white sweatshirt, rolled up sweatpants, and white tennis shoes; and a third man was wearing a white sweatshirt, t-shirt, and sweatpants.

After the exhibit was admitted and published, Mr. Proctor's counsel asked to approach the bench and requested that the photo be taken down, as he had just been informed by Mr. Proctor that he "believe[d]" the photograph was "taken in prison."

---

[2] The partial photograph, according to the government's brief, showed a "woman in a blue jean jacket and a man in street clothes."

After the jury went home for the day, the government raised the photograph to the court's attention and emphasized that the government "had no idea this was a prison photo." The trial court asked Mr. Proctor if he sought any relief, and he requested only that the photograph not be sent back to the jury. Although finding that it had "no reason looking at [the] photo[ ] to believe that the [g]overnment or the defense were aware necessarily that [it was a] prison photo[]," the court acknowledged that someone looking carefully at the photo might recognize the individuals within them to be wearing institutional clothing. But because the photograph was "put up briefly and taken down," the trial court found that the photograph's publication did not prejudice Mr. Proctor. The government volunteered to withdraw the photos; Mr. Proctor then asked the trial court to instruct the jury to disregard them; and the trial court did as Mr. Proctor requested.

Finally, in the third reference to Mr. Proctor's prior incarceration, a different witness, when asked "[w]hen about" she met Mr. Proctor, responded that she met him "shortly after he got released from prison." The government clarified, "I want to talk about what year," and after a question or two more, Mr. Proctor's counsel asked to approach the bench, objected (after explaining that he had not heard the reference and had been alerted to it by his client), and renewed his motion for a mistrial. The trial court, after finding that the prosecutor's question was not "designed to elicit" a response related to Mr. Proctor's previous incarceration, took

the renewed motion under advisement. After hearing argument at the end of the day, the trial court denied the renewed motion the following morning, applying similar reasoning to its initial denial.

After the government rested its case, Mr. Proctor renewed his motion for a mistrial, which the trial court again denied.[3] This time, the trial court added that it took "into account the strength of the government's case"—specifically noting that "the dying declarations and the ballistics themselves [were] fairly strong evidence" that "outweigh[ed] any minimal prejudice."

The second instance of alleged misconduct involved statements made by the government during its rebuttal argument. The government, when describing the jury's duty to weigh the evidence, referred to the scales of justice. Specifically, the prosecutor argued to the jury that it would know that the government had met its burden when the scale "look[ed] like a seesaw," one "with maybe a ten-year-old on one-end and a two-year-old on the other."

After the government had finished its rebuttal, Mr. Proctor objected and requested a mistrial, explaining that the government's scales-of-justice metaphor inappropriately suggested that the defense had a burden to present evidence.

---

[3] In his renewed motion for a mistrial, Mr. Proctor did not reference the photograph, and neither did the trial court.

Although the court did not believe that the government was "purposefully trying to suggest [an incorrect burden]," it agreed that the government's metaphor could have confused the jury regarding the burden of proof. The court did not, however, deem a mistrial necessary because: (1) "there wasn't a reference specifically to the defense evidence," and (2) the prosecutor "stated on at least two occasions . . . at both the beginning and the end that the government does bear the burden and what the burden was." The trial court instead elected to give a curative instruction:

> Ladies and gentlemen, I have a few instructions for you. The first one is to remind you of an instruction that I gave you yesterday: 'The defendant in this case, Mr. Proctor, has no burden of proof. That meant that he is not required to put on any evidence in this case. The government bears the burden of proving each of the elements of each of the offense[s] beyond a reasonable doubt.'

The jury, after hearing the evidence, convicted Mr. Proctor of all four counts: first-degree premeditated murder while armed, possession of a firearm during a crime of violence, unlawful possession of a firearm, and carrying a pistol without a license.

## C.    Sentencing

At sentencing, and without objection from Mr. Proctor, the trial court took judicial notice of the fact that Mr. Proctor had previously been convicted of second-degree murder, an aggravating factor which permitted the trial court to sentence Mr. Proctor to life without the possibility of release.

The trial court also gave Mr. Proctor the opportunity to speak, at which point he suggested that the judge who presided over his trial—Judge Danya Dayson—should have recused herself. Mr. Proctor pointed out that Judge Dayson had previously been a partner in a law firm with Jenifer Wicks, Esq., an attorney who had previously approached Mr. Proctor to ask him for assistance with respect to her representation of a different client. Mr. Proctor suggested that Attorney Wicks likely harbored resentment toward him for not helping her, and he suggested that Attorney Wicks' resentment should be imputed to Judge Dayson.

### III. Discussion

Mr. Proctor raises a number of issues on appeal. To begin, we will address the sufficiency of the evidence, the two grounds on which Mr. Proctor argues the trial court should have granted a mistrial, and his evidentiary argument. After resolving these issues, we will turn to the arguments raised in Mr. Proctor's pro se supplemental brief. For the reasons below, we affirm Mr. Proctor's convictions and decline to address his ineffective-assistance-of-counsel claims. We further stay our entry of judgement for 30 days, allowing Mr. Proctor the opportunity to develop the record on those arguments through a properly filed § 23-110 motion.

## A.    Sufficiency of the Evidence

Mr. Proctor first argues that the evidence was insufficient to sustain his murder conviction.  We disagree.

"We review the sufficiency of the evidence de novo," *Fitzgerald v. United States*, 228 A.3d 429, 436 (D.C. 2020), and consider "*all* the evidence admitted at trial, including the evidence appellant claims should have been excluded, regardless of whether the court erred in admitting it."  *Gore v. United States*, 145 A.3d 540, 545 n.7 (D.C. 2016) (emphasis in original).  "[W]e examine that evidence in the light most favorable to sustaining the verdict," and reverse a conviction "only if there is no evidence from which a reasonable mind might find the defendant guilty beyond a reasonable doubt."  *Jones v. United States*, 716 A.2d 160, 162 (D.C. 1998).  This requirement is not toothless, however: "there must be some relevant evidence in the record in support of each essential element of the charged offense[s]."  *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc).

Mr. Proctor's sufficiency argument faces significant hurdles.  The decedent told individuals attempting to treat his injuries that it was Mr. Proctor who had shot him.  Moreover, an eyewitness placed Mr. Proctor at the scene.  As this court has repeatedly affirmed, "the testimony of a single witness is sufficient to sustain a criminal conviction, even when other witnesses may testify to the contrary."  *Gibson*

*v. United States*, 792 A.2d 1059, 1066 (D.C. 2002). Here, because the testimony of two witnesses support Mr. Proctor's convictions, the evidence in this case was sufficient.

Mr. Proctor attempts to evade *Gibson*'s force by pointing out that Mr. Diggs was injured and under the influence of drugs at the time he identified Mr. Proctor as the perpetrator. This attempt fails. Mr. Proctor essentially contends that Mr. Diggs was not credible because of his drug use. But "this court is not in a position to substitute its judgment for that of the fact-finder when it comes to assessing the credibility of a witness." *Robinson v. United States*, 928 A.2d 717, 727 (D.C. 2007) (rejecting the argument that, because the witness was a drug abuser, a reasonable jury could not have credited them).[4] Accordingly, this court rejects Mr. Proctor's sufficiency argument.

### B.    Grounds for Mistrial

On appeal, Mr. Proctor raises two distinct issues for which he argues a mistrial should have been granted—the introduction of evidence of his prior incarceration and an improper closing argument made by the government. Although these issues

---

[4] Although the decedent did not testify at the trial, this Court has no less reason to defer to the jury's opinion of his credibility. The same reasoning applies to the testimony of the eyewitness who placed Mr. Proctor at the scene—testimony that Mr. Proctor notably fails to mention in his sufficiency argument.

do not rise to the level of a mistrial, we note that Mr. Proctor correctly identifies the significant risk to his rights when the government engages in misconduct, even if unintentional and merely careless. While we affirm the trial court's decision not to grant a mistrial, we take the opportunity to reaffirm the government's obligations raised in Mr. Proctor's appeal.

### 1. Evidence of Prior Incarceration

Mr. Proctor argues that the trial court abused its discretion by not granting a mistrial in response to the three references to his prior incarceration. He suggests, in essence, that the references caused the jury to convict him not because of the evidence against him, but because of the jury's belief that he was a career criminal.

References to a defendant's prior criminal history are, generally speaking, improper. As we explained in *Clark v. United States*, the "risk from the admissibility of a prior arrest of the defendant is that the jury may infer from the prior criminal conviction that the defendant is a bad [person] and that he [or she] therefore probably committed the crime for which he [or she] is on trial." 639 A.2d 76, 78-80 (D.C. 1993) (alterations in original) (internal quotation marks omitted). Even so, "reference[s] to a defendant's prior arrest or imprisonment do[] not necessarily require a mistrial." *Id.* Instead, the decision to declare a mistrial remains in the sound discretion of the trial court. *See id.* at 78-79. When evaluating the correctness

of the trial court's exercise of its discretion, this court considers "the gravity of the misconduct, the relative strength of the government's case, the centrality of the issue affected, and any mitigating actions taken by the court." *Id.* at 80. Mr. Proctor's appellate burden is a heavy one, as we are "loath to reverse" a trial court's denial of a mistrial, *Trotter v. United States*, 121 A.3d 40, 53 (D.C. 2015), and "will not overturn the trial court's decision unless it appears unreasonable, irrational or unfair, or unless the situation is so extreme that failure to reverse would result in a miscarriage of justice." *Goins v. United States*, 617 A.2d 956, 958 (D.C. 1992) (internal quotation marks omitted).

At bottom, this standard is not met here for five distinct reasons. First, we consider the gravity of the misconduct. Here, the government's errors brought before the jury not one, but *three* separate references to Mr. Proctor's prior incarceration. The gravity of these repeated infractions is mitigated, however, by the fact that the witnesses' statements (and the government's presentation of the photo) were "brief and nonspecific" as to the crime of conviction, which weighs against granting a mistrial.[5] *See McRoy v. United States*, 106 A.3d 1051, 1061 (D.C.

---

[5] We give little weight to the photo, recognizing that: (1) neither defense counsel nor the prosecution realized the photo was taken in prison until alerted at trial by Mr. Proctor; (2) the trial court recognized that the photo would require both close inspection and prior knowledge to determine that it contained institutional garb; and (3) Mr. Proctor did not ground his motions for mistrial on the photo, limiting them instead to the two witness references.

2015). Second, there is no evidence that any of the three incidents were "intentionally elicited by the government." *See id.* Third, the government presented a strong case grounded on multiple dying declarations, eyewitness testimony, ballistics evidence, and conduct by Mr. Proctor suggesting that he attempted to dispose of evidence, which renders it less likely that references to prior incarceration poisoned the jury's verdict. *See, e.g., Wilson v. United States*, 691 A.2d 1157, 1160 (D.C. 1997) (affirming the denial of a mistrial and emphasizing "the strength of the government's case"). Fourth, after the trial court offered and defense counsel declined a contemporaneous curative instruction, the court gave multiple instructions at the close of the case directing the jury not to consider evidence of prior criminality for improper purposes. *See Clark*, 639 A.2d at 80 ("[W]here a defendant asserts that certain testimony is so prejudicial as to require a mistrial, yet refuses any curative instruction, we will still consider whether a curative instruction was available that might have mitigated the alleged harm to the defendant's case."). Fifth, even if no improper references to Mr. Proctor's prior incarceration had occurred, the jury would have been informed of Mr. Proctor's prior conviction by way of a stipulation relating to the charge of unlawful possession of a firearm. Any increased prejudice caused by the witnesses' statements or the photograph, therefore, was marginal. The trial court thus acted well within its discretion in denying a mistrial.

## 2. Improper Closing Argument

Mr. Proctor separately contends that he was entitled to a mistrial based on the government's reference to the "scales of justice" during its rebuttal argument. Mr. Proctor's argument is that this reference confused the jury as to the standard of proof, suggesting that Mr. Proctor himself had a burden to put on evidence. The only way to clear up this confusion, argues Mr. Proctor, was to order a mistrial.

When reviewing a trial court's response to objected-to statements at oral argument, this court has said that "[i]f the challenged comments were in fact improper, and if objection to them was preserved, [this court] will affirm only if we are satisfied that the comments were not substantially prejudicial." *Trotter v. United States*, 121 A.3d 40, 55 (D.C. 2015). When evaluating whether resulting prejudice was substantial, this court "takes into consideration the context in which the comments were made, the gravity of the improprieties, their relationship to the issue of guilt, the effect of any corrective action taken by the court, and the strength of the government's case." *Id.* Moreover, a "criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements must be viewed in context." *Id.* at 57 (internal quotation marks omitted).

The prosecutor's statement mischaracterized the scales of justice displayed on the courtroom wall, implying that, rather than representing fairness and impartiality,

they weighed the government's proof against that of the defendant, and that the defendant's case was weaker.  The prosecutor's comments were patently improper.  Even so, no substantial prejudice occurred here.  Rather, the trial court repeatedly instructed the jury that Mr. Proctor bore no burden to "produce any evidence at all," admonished them that it was their "duty to accept the law as [the trial court] instruct[ed] [them]," and reminded them that the "statements and the arguments of the lawyers are not evidence."  Further, the prosecutors themselves stated that they bore the burden of proof, and defense counsel in his own argument emphasized the same point.  "Given the clarity of these instructions and the ease with which any reasonable person could understand them, [we] think it apropos to invoke here Justice Holmes' observation for the Court . . . that it would be absurd to upset a verdict upon a speculation that the jury did not do their duty and follow the instructions of the court."  *Allen v. United States*, 603 A.2d 1219, 1223-24 (D.C. 1992) (en banc) (alteration and internal quotation marks omitted) (rejecting the defendant's argument that "the prosecutor impermissibly shifted the burden of proof to him").  Moreover, here "the prosecution case was a formidable one."  *Id.* at 1226.  Viewing the prosecutor's statements, as we must, in the context of the entire case, there is no risk of substantial prejudice.

That said, we take this opportunity to remind the government that it serves as the arm of this nation's executive branch and, through its enforcement of our

criminal laws, wields enormous power. But that power must always be used wisely. A prosecutor's job is not about "winning," but instead—as then-Attorney General and future Supreme Court Justice Robert H. Jackson observed in speaking to a group of prosecutors at the U.S. Department of Justice over 80 years ago—it is about "fair play and decency . . . . Your positions are of such independence and importance that while you are being diligent, strict, and vigorous in law enforcement you can also afford to be just." Robert H. Jackson, Attorney General of the United States, Address at The Second Annual Conference of United States Attorneys: The Federal Prosecutor (Apr. 1, 1940). Our system of government is not self-executing; it relies on wisdom and self-restraint.

Prosecutors are held to a higher standard, a standard that requires them to ensure they uphold the rule of law and the fundamental rules of fairness in every trial, every settlement, every plea, and every legal argument in which they are involved. *See generally United States v. Van Engel*, 15 F.3d 623, 629 (7th Cir. 1993) (noting that prosecutorial power requires knowledge, experience, and sound judgment, not just good faith). At bottom, a prosecutor's mission is, as simply and eloquently summarized by Justice George Sutherland in *Berger v. United States*, to "[p]rosecute with earnestness and vigor; Strike hard blows, but . . . [do] not strike foul ones. [A prosecutor has as much] to refrain from using improper methods to get a wrongful conviction, as it is to use every legitimate means to bring about a just

one." 295 U.S. 78, 88 (1935). The government would be wise to reaffirm its commitment to these fundamental principles as it conducts its critical work on behalf of the citizenry.

## C.    The Forfeiture-by-Wrongdoing Doctrine under *Devonshire*.

Mr. Proctor asserts that the trial court abused its discretion by admitting Mr. Diggs's statements to Ms. Offutt regarding Mr. Proctor's attempt to stop him from testifying at the CPO hearing under the forfeiture-by-wrongdoing doctrine.

In *Devonshire v. United States*, 691 A.2d 165, 166 (D.C. 1997), this court adopted the forfeiture-by-wrongdoing doctrine whereby "a defendant forfeits his Sixth Amendment right to be confronted by a witness against him, as well as his objection to the introduction of hearsay, if he wrongfully procured the unavailability of that witness with the purpose of preventing the witness from testifying."[6] *Roberson v. United States*, 961 A.2d 1092, 1095 (D.C. 2008).

This court has construed the rule broadly.  While this appeal highlights a few areas where this rule might be limited, the case at hand does not extend beyond the prophylactic boundaries this court has already set for the rule.  Generally, these

---

[6] In his supplemental brief, Mr. Proctor repeatedly asserts that the application of the *Devonshire* doctrine violated his rights under the Confrontation Clause.  But because *Devonshire* creates an exception to the Confrontation Clause, where the trial court does not abuse its discretion in applying *Devonshire*, this argument is meritless.

foreseeable limits relate to *who* has brought the case at which damaging testimony is expected, *what* kind of testimony is considered under the rule, *why* the defendant caused the witness's unavailability (i.e., intent), and the defendant's relationship to the case for which testimony was to be given. We decline to adopt any such limitations here.

"To successfully invoke the [forfeiture-by-wrongdoing] exception, the government must demonstrate [by a preponderance] that (1) the defendant engaged in wrongdoing that caused the witness's unavailability; and (2) did so in order to prevent the witness from testifying." *Hairston v. United States*, 264 A.3d 642, 646 (D.C. 2021) (alteration and internal quotation marks omitted). The Supreme Court clarified in *Giles v. California* that, for the forfeiture-by-wrongdoing doctrine to apply, the defendant must have "engaged in wrongful conduct *designed* to prevent a witness's testimony." 554 U.S. 353, 366 (2008). This intent requirement means that "the exception applies only if the defendant has in mind the particular purpose of making the witness unavailable." *Id*. Thus, the intent of the wrongdoer arises as a natural limitation to the applicability of the doctrine. However, this court has construed this requirement broadly, holding that the witness's unavailability need not be the *sole* purpose of the wrongdoer, and can be one of multiple purposes. *Hairston*, 264 A.3d at 646.

Regarding what kind of testimony is considered under the rule, forfeiture applies not only to the proceeding at which the witness was set to testify, but also *any proceeding* relating to the defendant's successful effort to render the witness unavailable. *See Hairston*, 264 A.3d at 648 (citing *State v. McLaughlin*, 265 S.W.3d 257, 272 (Mo. 2008) (emphasis added)); *and see generally United States v. Gray*, 405 F.3d 227, 242 (4th Cir. 2005) ("A defendant who wrongfully and intentionally renders a declarant unavailable as a witness in any proceeding forfeits the right to exclude, on hearsay grounds, the declarant's statements at that proceeding and any subsequent proceeding."); *United States v. Dhinsa*, 243 F.3d 635, 652-53 (2d Cir. 2001) (holding that the federal forfeiture-by-wrongdoing rule "places no limitation on the subject matter of the declarant's statements that can be offered against the defendant at trial to prove that the defendant murdered the declarant").

This court reviews for abuse of discretion a trial court's determination that the government met its burden under *Devonshire* and its factual findings for clear error. *Jenkins v. United States*, 80 A.3d 978, 997 (D.C. 2013).

We determine that the trial court did not abuse its discretion by admitting the decedent's statements under the forfeiture-by-wrongdoing exception. In *Hairston*, this court affirmed the exception's application where: (1) the defendant expected the potential witness's testimony at a CPO hearing to lead to his separation from his daughter (giving him a motive to silence the witness), (2) prior to the murder, the

defendant communicated with the potential witness in an effort to dissuade them from testifying at the hearing, (3) the defendant's efforts at nonviolent persuasion were unsuccessful, and (4) the murder occurred shortly before the CPO hearing. 264 A.3d at 648. The instant case is in step with *Hairston*: the trial court relied on the government's unchallenged factual proffer that (1) Mr. Diggs was expected to testify at the CPO hearing about a serious assault in which Mr. Proctor and his father both participated (motive), (2) Mr. Proctor asked Mr. Diggs not to testify and offered to compensate him for his restraint (previous attempt to dissuade), (3) Mr. Diggs told another witness that he would testify at the CPO hearing despite Mr. Proctor's offer (nonviolent persuasion unsuccessful), and (4) the decedent was murdered one week before the CPO hearing (temporal proximity).[7] As in *Hairston*, these circumstances "permitted the trial court to find it more likely than not that [Mr. Proctor] had, as at

---

[7] Mr. Proctor suggests that the trial court based its ruling on an improper factual foundation—that, according to him, the trial court believed that Mr. Proctor's father filed for a CPO in response to a violent felony, and not (as was actually the case) in response to a series of threatening texts. The transcript when viewed in its entirety, however, belies Mr. Proctor's contention. It is clear from context that the trial court, when referring to a felony, was referencing the pre-CPO assault in which both Mr. Proctor and his father allegedly participated—the assault that the decedent was expected to testify about in an effort to prevent Mr. Proctor's father from securing a CPO.

least one purpose in murdering [the decedent], the purpose to keep [him] from . . . testifying at the imminent CPO hearing." *See id.* at 649.[8]

Mr. Proctor raises four arguments attacking the trial court's *Devonshire* ruling. In his first, he suggests that the prosecution presented "no evidence[] except for the very hearsay sought to be admitted." This suggestion is incorrect: the trial court relied on a *combination* of the decedent's hearsay statements and circumstantial evidence. This court approved a trial court's reliance on such a combination in *Jenkins*. *See* 80 A.3d at 996 (affirming the trial court's application of the forfeiture-by-wrongdoing doctrine because, "[g]enerally speaking, it is appropriate and common for judges to consider the substance of proffered hearsay together with independent evidence in determining whether a hearsay exception is available").

Turning to his second argument, Mr. Proctor posits that the *Devonshire* doctrine should not apply to CPO hearings at which the person who benefits from the witness's absence is the *petitioner*. He reasons that because a petitioner can avoid anticipated, harmful testimony at a CPO hearing by voluntarily dismissing the

---

[8] "[T]he government [was] not required to show that a defendant's sole purpose was to silence the declarant." *Hairston*, 264 A.3d at 646 (internal quotation marks omitted).

CPO action, "it is unreasonable" to infer that someone "would harm a potential witness to silence him under these circumstances."

We decline to adopt such a per se rule for three reasons.  First, this court in *Devonshire* did not limit forfeiture by wrongdoing to particular proceedings.  Rather, this court held instead that the doctrine applies wherever the wrongfully absented witness is "expected to give damaging testimony . . . in some future proceeding." 691 A.2d at 166.  Nothing in *Devonshire* suggests that the adopted forfeiture-by-wrongdoing doctrine depends upon the defendant's party status in the underlying proceeding.  Second, trial courts are "not required to find that [a defendant's] thinking included . . . rational analysis"—the fact that Mr. Proctor could have taken less drastic means to prevent harmful testimony does not preclude the inference that he instead resorted to violence.  *See Hairston*, 264 A.3d at 648.  And third, if this court were to carve out a particular type of proceeding entirely from the forfeiture-by-wrongdoing analysis, it would create the "perverse consequence" that participants in that type of proceeding can seek to discourage witness testimony with lesser consequence.  *Cf. id.* at 646 (internal quotation marks omitted) (reasoning that, if the forfeiture-by-wrongdoing doctrine did not apply where a defendant had multiple motives for killing a potential witness, defendants would have an easy exit-ramp from liability).  The wiser course, rather than render the forfeiture-by-wrongdoing's application dependent on case caption, is to instead assess the

doctrine's application on a case-by-case and fact-specific basis. And in this case, as explained above, the trial court did not abuse its discretion in applying the doctrine.

Mr. Proctor in his third argument emphasizes that, under the government's theory of the case, he secured the decedent's absence from the CPO proceeding to benefit his *father*. According to Mr. Proctor, therefore, the doctrine cannot apply unless the government shows, by a preponderance of the evidence, a conspiracy between Mr. Proctor and his father to kill the decedent. This argument, however, is based on a faulty factual premise. Because the decedent was expected to testify at the CPO hearing about an assault in which both Mr. Proctor's father *and Mr. Proctor* participated, Mr. Proctor also benefited from the absence of sworn testimony regarding that assault. Accordingly, this case is not a pure third-party case.

Regardless, in *Ward v. United States*, this court approved forfeiture-by-wrongdoing's application where a defendant kills a witness to prevent the witness from testifying against a third party. 55 A.3d 840, 849 (D.C. 2012) ("We discern no reason why the doctrine should not apply where, by a preponderance of the evidence, the trial court finds that a defendant procured a witness's death to benefit some *other* person."). Contrary to Mr. Proctor's suggested interpretation of our *Devonshire* jurisprudence, in *Ward* we did not condition the doctrine's application on a finding of conspiracy. Indeed, Mr. Proctor identifies no court that has adopted his suggested gateway conspiracy requirement.

Lastly, the absence of a conspiracy requirement aligns with the purpose of the rule. The intentional disposal of a potential adverse witness harms the justice system regardless of whether the person to whom the witness is adverse accedes[9] to the witness's disposal. The harm to the justice system is the same, so the consequences associated with the disposing party's actions, rightly, should be the same. In short, carving out non-conspiracy third-party cases from forfeiture-by-wrongdoing's application does not serve the policy goals underlying the doctrine.

In his fourth and final *Devonshire* argument, Mr. Proctor claims that the decedent could not be considered a potential witness as a matter of law because "the possibility of *criminal charges* was too remote, speculative, and attenuated as to Mr. Proctor to support a finding of forfeiture by wrongdoing." Our precedent, however, is wholly inconsistent with the idea that a potential witness's testimony must subject the decedent or someone else to the risk of criminal liability. *See Hairston*, 264 A.3d at 649 (affirming the application of the forfeiture-by-wrongdoing doctrine where the defendant allegedly killed the witness to prevent them from testifying at a CPO proceeding that, if it led to the issuance of a protective

---

[9] The crime of conspiracy occurs when, among other requirements, two or more persons *agree* to commit a criminal offense. *Campos-Alvarez v. United States*, 16 A.3d 954, 965 (D.C. 2011).

order, might have prevented him from visiting his daughter). Accordingly, we reject Mr. Proctor's fourth argument.

### D. Pro Se Supplemental Brief

#### 1. Excited Utterance

Mr. Proctor challenges the trial court's admission of Diane Offutt's 911 call as an excited utterance. This court's common-law evidence jurisprudence bars parties from admitting hearsay—i.e., "an out-of-court statement offered to prove the truth of the matter asserted"—at trial. *Dutch v. United States*, 997 A.2d 685, 688 (D.C. 2010). This hearsay bar, however, is subject to numerous exceptions, one of which—the "excited utterance" exception—allows a party to admit a hearsay statement if the declarant made the statement while "manifestly overcome" with emotion stemming from an exciting event. *Mayhand v. United States*, 127 A.3d 1198, 1202 (D.C. 2015).

Here, we need not determine whether Ms. Offutt's statement qualified under this exception. Assuming without deciding that the trial court erred by admitting the call as an excited utterance, we hold that the call's admission was harmless because we can "say[] with fair assurance that the error did not substantially sway the judgment," or, put differently, it is highly probable that the error at issue did not contribute to the verdict. *Gabramadhin*, 137 A.3d at 185; *see also Kotteakos v.*

*United States*, 328 U.S. 750 (1946). The dying declaration admitted through the 911 call was patently cumulative: Ms. Offutt herself testified separately about what her brother told her during the call and a separate dying declaration was also admitted through the testimony of a witness who ministered to the decedent at the scene of the shooting. Moreover, the government's case was strong, relying not only on the dying declarations, but also on an eyewitness placing Mr. Proctor at the scene, ballistics evidence, cell site evidence of the defendant's location at the time of the murder, and Mr. Proctor's attempt to dispose of evidence (his phone).

## 2. Cabined Cross-Examination

Mr. Proctor next complains that the trial court erred by restricting his cross-examination in two respects: (1) by disallowing him from questioning Ms. Offutt regarding her history of mental illness, and (2) by preventing him from questioning Ms. Offutt regarding certain texts and voicemails she sent. However, the record does not reveal that the trial court prevented him from cross-examining Ms. Offutt about either topic.

First, on the topic of mental illness, the trial court did not preclude Mr. Proctor from cross-examining Ms. Offutt regarding her mental health history; instead, Mr. Proctor's *counsel* made the strategic decision not to pursue that line of questioning to avoid opening the door to testimony about her dead son, which might

have made Ms. Offutt more sympathetic to the jurors. Outside of the ineffective-assistance context, Mr. Proctor cannot assign a decision of his counsel to the trial court and call it error. *See Richbow v. District of Columbia*, 600 A.2d 1063, 1064 n.1 (D.C. 1991) ("Appellant may not claim prejudice from an inability to cross-examine on the issue of causation when the record is clear that her counsel made a tactical decision not to probe the issue at all.").

The same is true regarding allegedly false texts sent by Ms. Offutt. Defense counsel made the strategic decision not to ask Ms. Offutt about select accusations of criminal conduct she made in texts to avoid opening the door to references to Mr. Proctor's criminal history.[10] Again, outside the context of an ineffective assistance claim, Mr. Proctor cannot fault the trial court for a strategic decision made

---

[10] Mr. Proctor does not argue, either in his brief filed by counsel or in his pro se supplemental brief, that the trial court erred in its determination that if Mr. Proctor inquired into certain texts, it would allow the government to place those texts into context by referencing Mr. Proctor's criminal history. Even if he had, such an argument would likely have failed. *See Valdez v. United States*, 320 A.3d 339, 365-66 (D.C. 2024) ("[O]ther-crimes evidence that is not admissible against a defendant to prove propensity or under *Drew* or the *Johnson* exceptions may be rendered admissible if the defense, through delimited, incomplete, or misleading examination of a witness, invites factual inferences materially adverse to the prosecution that revelation of the criminal context would dispel or undercut.").

by his attorney.[11]   Thus, the trial court did not err by improperly limiting cross-examination.

### 3.  Substitute Expert

Mr. Proctor next points out that the government initially named a firearm expert who was under investigation for alleged errors made in prior cases, only to later replace that firearm expert with a different one.  According to Mr. Proctor, the trial court erred by allowing the government to present this new expert "as if he was on the case from the beginning."[12]   Moreover, Mr. Proctor suggests that the new expert's opinion was improperly "predicated on the truth of [the] absent analyst's factual statements."

Because Mr. Proctor did not raise any issues related to the government's substitution of its expert to the trial court's attention, we review the trial court's handling of that substitution for plain error; i.e., this court should reverse only if Mr. Proctor shows that: "(1) there is error[;] (2) such error is plain, meaning clear or

---

[11] This logic also defeats Mr. Proctor's claim that the trial court prevented him from showing his tattooed wrists to the jury in an attempt to argue that he was not the person depicted holding a firearm in a government exhibit.  Mr. Proctor's own brief makes clear that it was his counsel, and not the trial court, that prevented him from introducing this evidence.  Indeed, the transcript reveals no instance in which the trial court was apprised that Mr. Proctor wished to show his forearms to the jury.

[12] Mr. Proctor further complains that the new expert "used to work in the same lab that was scrutinized in 2015."  The expert's previous workplace, however, is neither dispositive of the expert's qualifications nor the veracity of his opinions.

obvious, by the time of appellate review; (3) the error affected appellant's substantial rights; and (4) the error seriously affected the fairness, integrity, or public reputation of [the] judicial proceedings." *Thompson v. United States*, 322 A.3d 509, 515 (D.C. 2024) (alterations in original).

To the extent Mr. Proctor complains about the government substituting its expert, Mr. Proctor has not shown plain error. In criminal cases, the procedure governing the government's expert witnesses is set by Sup. Ct. Crim. R. Pro. 16(a)(G), which requires the government to disclose the experts on which it plans to rely at trial early enough in the process to give the defense time to prepare. Nothing in Rule 16, however, bars the government from substituting its expert witness, provided it does so in a timely manner and makes the required disclosures. And because Mr. Proctor has not identified any way in which the government's disclosure of its substitute expert violated Rule 16, he has not shown plain error.

Nor has Mr. Proctor shown plain error with respect to the new expert's testimony. A violation of the Confrontation Clause may occur where an expert testifies about the results of an analysis conducted by a different, non-testifying expert. *See Smith v. Arizona*, 602 U.S. 779, 783 (2024). But here, Mr. Proctor's contention that the new expert merely parroted the conclusions of the old expert is belied by the record: the government notified Mr. Proctor before trial that the new expert would conduct an independent examination of the ballistics evidence, and the

new expert testified under oath that he had done so.  There is no reason to believe, therefore, that Mr. Proctor's rights under the Confrontation Clause were violated.  Mr. Proctor's claims of error with respect to the expert fail.

### 4.  Judicial Notice of Mr. Proctor's previous conviction

In his next argument, Mr. Proctor contends that the trial court erred by not requiring the jury to find beyond a reasonable doubt that he had previously been convicted of murder, an aggravating factor that permitted the trial court to sentence him to life imprisonment without the possibility of release.  D.C. Code § 22-2104.01(b)(12).  Rather than turn to a jury, the trial court found that fact itself via judicial notice, without objection by Mr. Proctor.

Because Mr. Proctor did not raise a contemporaneous objection, we again review for plain error and find none.  This court has repeatedly allowed trial courts to find the fact of a prior conviction at sentencing and then apply a penalty enhancement.  *See Dorsey v. United States*, 154 A.3d 106, 122-26 (D.C. 2017); *Bland v. United States*, 153 A.3d 78, 79-80 (D.C. 2016).  Mr. Proctor fails to raise any basis for deviating from our prior holding on this issue and, thus, we reject Mr. Proctor's sentencing argument.

### 5. Recusal

Finally, Mr. Proctor suggests that two of the judges involved in his case should have recused themselves. He first argues that the initial judge assigned to his case, Judge Pan, should have recused herself due to alleged animosity she expressed toward one of his initial attorneys (who was later replaced). Second, he suggests that the judge who replaced Judge Pan, Judge Dayson, should have recused herself because she was previously a partner in a law firm with attorney Jenifer Wicks, Esq. According to Mr. Proctor, Attorney Wicks had reason to dislike him because he had previously refused to help her put on a defense for a client.

When evaluating whether a trial judge should have recused themselves from a case, this court asks whether "an objective, disinterested observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt that justice would be done in the case." *Tarrio v. United States*, 282 A.3d 86, 95 (D.C. 2022). Here, no significant doubt exists with respect to either judge. Regarding Judge Pan, because Mr. Proctor's case was assigned to a different judge shortly after he motioned for her recusal, Mr. Proctor received the very relief he requested. With respect to Mr. Proctor's complaints as to Judge Dayson, Mr. Proctor's connection to the judge was sufficiently attenuated such that no reasonable person would doubt her impartiality. Indeed, the record gives no reason

to even suspect that Judge Dayson was made aware of any relationship between her former law partner and Mr. Proctor until he raised the issue at sentencing.

### 6. Ineffective Assistance of Counsel

Mr. Proctor, also dissatisfied with his counsel's performance, raises additional arguments in a pro se supplemental brief. The bulk of Mr. Proctor's supplemental, pro se motion is dedicated to his contention that his trial counsel provided constitutionally ineffective assistance. But, as the government recognizes, "in the overwhelming majority of cases, it is inappropriate to raise the issue of ineffective assistance of counsel on direct appeal." *Simpson v. United States*, 576 A.2d 1336, 1338 (D.C.1990). Indeed, this Court "generally require[s] a separate motion to be filed in order to raise an ineffective assistance of counsel claim," as a separate motion allows both parties to develop the record with respect to counsel's decision-making and any prejudice flowing therefrom. *In re R.K.S.*, 905 A.2d 201, 208 (D.C. 2006). This rule is subject to only limited exceptions, for instance, in the "peculiar circumstance[]" wherein the existing record is "replete with details regarding the representation issue." *Id.* at 209.

Here, because Mr. Proctor makes aspersions regarding his counsel's preparation (or lack thereof) and criticizes strategic decisions that cannot be intelligently evaluated based on the appellate record alone, we decline to address

Mr. Proctor's ineffective-assistance arguments on direct appeal. Instead, we affirm Mr. Proctor's convictions without prejudice to him filing a § 23-110 motion to develop the record on his claims of ineffective assistance. *See Williams v. United States*, 783 A.2d 598, 602 & n.4 (D.C. 2001) (en banc).[13] Accordingly, we delay our entry of judgment by 30 days from the date of this opinion to give Mr. Proctor time to file his motion during the pendency of his direct appeal, thereby avoiding the procedural bar announced by this court in *Shepard v. United States*, 533 A.2d 1278, 1280 (D.C. 1987). *Cf. Simpson*, 576 A.2d at 1339. We remind Mr. Proctor's appellate counsel of their duty under *Doe v. United States* with respect to such a motion. *See* 583 A.2d 670, 674 (D.C. 1990).

## IV.    Conclusion

For the foregoing reasons, we affirm Mr. Proctor's convictions without prejudice to Mr. Proctor raising his ineffective assistance of counsel claims in the Superior Court. Mr. Proctor will have thirty days after the issuance of this decision to afford him the opportunity to file a § 23-110 motion during the pendency of his

---

[13] Mr. Proctor avers in his pro se supplemental brief that he filed a § 23-110 motion alleging ineffective assistance of counsel just prior to sentencing. The trial court, however, did not consider Mr. Proctor's filing to be a § 23-110 motion, instead construing it as a motion for new counsel. Mr. Proctor, therefore, has not yet had the opportunity to develop the record on his trial counsel's effectiveness.

direct appeal. After those thirty days, this court shall issue the mandate in normal due course.

*So ordered.*